U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 JUN 23  AM 9: 16

CLERK
BY ___AL___
DEPUTY CLERK

| | |
|---|---|
| **GREGORY BUNCE,** Individually and as Personal Representative of the Estate of Peter Bunce, and<br><br>**EVELYN BUNCE,** Individually,<br><br>          Plaintiffs,<br><br>    v.<br><br>**GLOCK, INC.,** a Georgia corporation, and<br><br>**GLOCK GES.M.B.H.,** an Austrian corporation conducting business in the United States,<br><br>          Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 2:23- CV- 133 |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Gregory and Evelyn Bunce, by and through undersigned counsel, hereby complain against Defendants as follows:

## INTRODUCTION AND PARTIES

1.     This strict products liability and negligence action arises from the wrongful death of Peter Bunce, a three-year-old child who unintentionally shot himself in the face with a Glock 26 pistol on June 26, 2021 in Barre, Vermont. Defendants have nicknamed the gun that killed Peter the "Baby Glock" due to its smaller size and light weight. Defendants intentionally designed the Baby Glock

1

without a manual safety, making it entirely foreseeable that a three-year-old child would unintentionally shoot himself. Alternative designs existed that could achieve Glock's goal of having a "hair trigger" pistol that fires instantly and without delay. Such alternative designs would have been safer around children and would have avoided Peter's death. This action also alleges that Glock intentionally provided deceptive and inadequate warnings to end users of the Baby Glock. Finally, this action alleges negligent infliction of emotional distress, bystander liability, and loss of consortium because Peter's father was downstairs when Peter shot himself.

2.     Plaintiffs Gregory ("Greg") and Evelyn Bunce are a married couple residing in Saco, Maine. They are the parents of Peter D. Bunce ("Peter"), who died on June 26, 2021, at three years of age.

3.     Greg Bunce is the personal representative of Peter's estate. Peter resided in Saco, Maine until his death.

4.     Evelyn Bunce brings this action individually. Greg Bunce brings this action individually and as personal representative of Peter's estate.

5.     Defendant Glock, Inc. is a Georgia corporation with a principal place of business in Georgia. Glock, Inc. places its products into the stream of commerce throughout the United States, including in Vermont.

6.     Defendant Glock Ges.m.b.H. is a foreign corporation based in Deutsch-Wagram, Austria.

7.     Upon information and belief, Glock Ges.m.b.H. is the parent company of Glock, Inc. and the manufacturer of the firearm that killed Peter.

8.     Upon information and belief, the third generation Glock 26 (the "Baby Glock") that killed Peter was imported to the United States by Glock, Inc., which distributed the gun and placed it into the chain of commerce in a defective and unreasonable dangerous condition.

9.     Glock, Inc. is the designated and named business agent for Glock Ges.m.b.H. and the distributor for Glock pistols in the United States, including the Baby Glock at issue in this case. Therefore, Glock Ges.m.b.H. may be served with process pursuant to Federal and State Rules of Civil Procedure by delivering service to Glock Ges.m.b.H.'s alter ego, Glock, Inc., at its corporate headquarters in Georgia, by and through Glock, Inc.'s registered agent.

10.     Unless the allegations set forth in this Complaint otherwise indicate, both Glock, Inc. and Glock Ges.m.b.H. are referred to herein collectively as "Glock."

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action under 28 U.S.C. § 1332, because there is complete diversity between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to the claim occurred within this District.

13.     Defendants committed acts of negligence in this state or territory, resulting in the wrongful death and damages alleged herein.

14.     Defendants committed acts of negligence outside this state or territory, resulting in the wrongful death and damages alleged herein.

15.     Defendants manufactured, designed, distributed, furnished, and/or sold in a national marketing scheme a defective product that foreseeably found its way into this state or territory, resulting in the wrongful death and damages alleged herein.

## BACKGROUND FACTS

16.     In June of 2021, Plaintiff Greg Bunce's brother, Kenneth Bunce ("Ken"), was dating a woman named Rebecca Post ("Rebecca"). Rebecca lives and owns a home in Barre, Vermont.

17.     On June 25, 2021, Greg took two of his children, Peter who was three years old, and Ellie who was seven, on a trip to visit Ken and Rebecca in Barre.

18.     Ken and Rebecca invited Greg and his two children to stay with them at Rebecca's home on the night of June 25, 2021.

19.     On the night of June 25, 2021, Greg, Peter, and Ellie slept in an upstairs guest bedroom at Rebecca's home, while Ken and Rebecca slept in the upstairs master bedroom.

20.     Unbeknownst to Greg and Evelyn, Rebecca kept a loaded 9mm Glock 26 pistol in a soft, unlocked case in or around her bedside table.

21.     Upon information and belief, the Baby Glock 26 owned by Rebecca was a third generation.

22.     On the morning of June 26, 2021, Rebecca and Ellie left the house to go shopping. Greg, Ken, and Peter prepared to visit Ken's house.

23. Around 11:00 am, having no idea as a three-year-old child how to operate a firearm, Peter found the Baby Glock in Rebecca's beside table and unintentionally discharged a bullet from the Baby Glock into his face.

24. Peter died from the gun shot wound.

25. The Baby Glock lacked an adequate safety or design to stop the above-described action by a three-year-old child with small, weak hands and no idea how to operate a firearm.

26. Greg was just downstairs in the bathroom when he heard the gunshot and a thud from upstairs, placing him in immediate fear for his own life.

27. Peter was only out of sight for a matter of seconds before he accidentally discharged the Baby Glock at his own face.

28. Upon information and belief, the Baby Glock that killed Peter was never altered and was maintained in good working condition from the time of purchase until the date of Peter's death.

29. Greg and Evelyn have suffered tremendous pain and pecuniary losses from the sudden and horrific death of their young son.

30. Greg and Evelyn have experienced severe emotional and mental distress, including distress and trauma from the loss of love and companionship and the destruction of the parent child relationship, as well as the circumstances of Peter's death.

31. Defendants designed, manufactured, distributed, sold, and placed into the stream of commerce a Baby Glock with multiple design defects, including but not

limited to its action, safety drop system, safety components, and the absence of a manual safety.

32.     Defendants designed, manufactured, and distributed the Baby Glock that killed Peter knowing and expecting that the pistol would be used by ordinary consumers, not just law enforcement.

33.     Upon information and belief, Glock intentionally designs its firearms with a lack of manual safety to make more money by convincing gun enthusiasts and law enforcement that Glock's products are superior because they lack a manual safety.

34.     Glock markets many of its products, including the Baby Glock, as being a superior firearm specifically because it lacks a manual safety and can be shot instantly.

35.     Glock intentionally designs its firearms, including the Baby Glock, with a light trigger pull compared to other handguns.

36.     Upon information and belief, the Baby Glock that killed Peter had a trigger pull of 28 Newtons, which corresponds to 6.29465 pounds of pressure.

37.     Glock knew or should have known that a three-year-old with no idea how to operate a firearm safely could discharge the Baby Glock with the light trigger pull of 28 Newtons.

38.     The light trigger pull of the Baby Glock, combined with its lack of a manual safety, made the Baby Glock an incredibly dangerous product that Glock knew posed specific hazards to human life, especially children.

39.     The Glock pistols most often carried by law enforcement officers on duty are the Glock 17, 19 or 22.

40.     Defendants knew or should have known that the Glock 26 is typically carried by civilians or off duty police officers, not for on-duty law enforcement.

41.     There is no justifiable rationale or need for the Baby Glock to have such a light trigger pull and/or the absence of a manual safety.

42.     Glock knew or should have known that the compact, lightweight design of the Glock 26 would be especially appealing to female gun purchasers.

43.     Glock markets and advertises the Baby Glock as being a great firearm for women to concealed carry.

44.     The manner in which Glock markets all of its firearms, but especially the Glock 26, makes it entirely foreseeable that they would end up in homes where children were present.

45.     Glock knows or should know that young children, and especially young boys, are curious about and fascinated by guns.

46.     Glock's product literature purports to acknowledge this risk, but in doing so is intentionally deceptive. For example, Glock warns end users that: "Children are attracted to and can operate firearms that can cause severe injuries or death. Prevent child access by always keeping guns locked away and unloaded when not in use." This warning is both deceptive and inadequate because Glock knows that the allure of its product is the promise of self-protection in the home, which can only be achieved by storing a loaded, unlocked firearm beside the bed. Glock is aware of

research indicating that children will be exposed to loaded firearms, but does nothing to create more detailed or effective warnings.

47.    Glock fails to warn end users of the Baby Glock of the risks posed by the light trigger pull and lack of an external safety, or that safer and more reasonable design alternatives exist.

48.    Glock's product literature deceives end users about the fact that its lack of an external safety makes Glock pistols far more dangerous than the competition. For instance, Glock's product literature states that: "This firearm like most modern revolvers, or auto loading pistols, is designed without an external manual safety." In reality, other handguns sold by the competition have external or manual safeties because competing manufacturers recognize the extreme risk to human life, especially children, when a firearm has no manual safety.

49.    Glock's product literature misleads end users into believing that its Safe Action System, or internal safeties, will prevent accidental discharge of the firearm.

50.    Glock knew or should have known that a more reasonable design was feasible for the Glock 26, which would provide some sort of additional manual safety while also retaining Glock's claim to fame that its guns fire more quickly than the competition.

51.    Comparing the danger of Glock's claim to fame that its guns fire more quickly than the competition with the utility of a gun without a manual safety, the Baby Glock was an unreasonably dangerous and defectively designed product.

52.     Glock knew or should have known that a firearm like the Glock 26 can accidentally discharge with very little trigger pull weight, such as the trigger pull accomplished by a three-year-old boy.

53.     Upon information and belief, Glock is aware of other instances of children pulling the light 28 Newton trigger weight and unintentionally discharging firearms that lack a manual safety.

54.     Glock does not adequately inform consumers that a safer alternative to the Glock 26 exists.

55.     Glock's Safe Action System consists of mechanical, not manual, safeties.

56.     Glock's Safe Action System is not intended to prevent a small child from firing the Baby Glock.

57.     Reasonable and feasible design alternatives existed that Glock could have implemented to ensure that a manual safety on the Glock 26 would prevent a small child from discharging the firearm.

58.     Alternatively, it was feasible and would have been reasonable for Defendants to design the Baby Glock with a heavier trigger pull that could not be depressed fully by the tiny hands of a small child.

59.     Defendants knew or should have known that many of their customers store guns in unlocked locations, while loaded, and that these areas are accessible to children.

60.    The very purpose of a civilian owning a Baby Glock is for self-protection, which is best achieved by having access to a firearm that is loaded and in an unlocked location.

61.    Women to whom Glock markets and sells the Baby Glock, like Rebecca Post, are induced to purchase these firearms for the express purpose of self-protection and keeping a loaded firearm in a bedside table for protection.

62.    Defendants knew or should have known that the gun industry's advertising, marketing, and messaging leads consumers to believe that they need to purchase guns and store them unlocked and loaded, in order to quickly defend themselves and their families.

63.    Glock's entire product line is based on the idea that the time it takes to disengage a manual safety is unacceptable and creates a risk of harm because the gun owner could be shot before they can disengage the safety. If Glock believes the milliseconds needed to disengage a manual safety is not acceptable, then Glock knows its end users will not store these weapons locked up and unloaded.

64.    Defendants knew or should have known that children visiting the home of a gun owner like Rebecca are at risk of dying from unintentional shootings unless Glock's products are made with safety features that will prevent foreseeable harm.

65.    Defendants knew or should have known that it is commonplace and foreseeable that guns are not the kind of products only used by sophisticated and highly trained end users. Instead, Rebecca Post was a typical user of a Baby Glock.

66.     Defendants knew or should have known that the Baby Glock will be stored in an area accessible to children. In fact, a study of data from the National Center for Health Statistics indicated that:

    a. A majority of gun owners living with children do not store their firearms locked, unloaded, and separate from ammunition;

    b. Approximate 40 percent of gun owners do not store their firearms locked in any manner;

    c. About 8.3 million children in the U.S. live in homes where a firearm is stored unlocked; and

    d. 2.6 million children live in homes where a firearm is also stored loaded or with ammunition.

67.     Because of the above research, and many other related studies known to Glock, Defendants knew that the Baby Glock was likely to be stored unlocked in a residential setting where children would be present.

68.     Despite recognizing the risks that Glock pistols with light trigger pulls and no external safeties pose, Glock recklessly failed to take any steps in the past three decades to make its guns safer for civilians and children in the United States.

69.     Defendants knew or should have known that its firearms, especially the Baby Glock which is not designed for on-duty law enforcement, could easily be designed, manufactured, and sold with additional or better safety features that would prevent serious harm, and greatly reduce the risk of death from an unintentional shooting like Peter's.

70. The only reason Defendants do not take additional or better measures to design and manufacture safer Glock pistols is because Defendants want to drive sales and make more money.

71. Upon information and belief, Glock has no incentive to make its pistols safer because the company believes a safer firearm designed to protect human life from unintentional shootings would diminish the appeal of Glock's reputation for having a "hair trigger" and no external safety, compared to the competition.

72. Glock designs its pistols to be unsafe on purpose simply to gain a competitive edge in market share.

73. Some law enforcement agencies have stopped using Glock pistols altogether because even police officers well trained in firearm safety have unintentionally shot themselves with a Glock.

74. The absence of an external safety on the Baby Glock is unreasonably dangerous and amounts to a design defect.

75. The absence of a heavier trigger pull on the Baby Glock is unreasonably dangerous and amounts to a design defect.

### COUNT I
### STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (Both Defendants)

76. Plaintiffs repeat and reallege each of the allegations contained in Paragraphs 1 through 75 of their Complaint as if fully stated herein.

77.     Defendants are engaged in the business of selling firearms like the Baby Glock that discharged into Peter's face without an adequate design to stop such an occurrence at the hands of a three-year-old child.

78.     The Baby Glock was sold and/or distributed by Glock, Inc. in a defective condition unreasonably dangerous to the foreseeable, ultimate users of the product, including Peter Bunce.

79.     The Baby Glock was manufactured and/or sold by Glock Ges.m.b.H. in a defective condition unreasonably dangerous to the foreseeable, ultimate users of the product, including Peter Bunce.

80.     Rebecca Post and her house guest, Peter Bunce, were persons whom Glock might reasonably have expected to use the Baby Glock for any purpose that met the specifications set forth by the manufacturer and its warnings/product literature.

81.     The Baby Glock manufactured and/or distributed by Defendants was defective, unreasonably dangerous, and/or unreasonably designed when sold to Rebecca Post and used by Peter Bunce.

82.     Defendants knew or should have known that firearms pose a unique and significant risk of injury and death to children.

83.     The use of the Baby Glock by Rebecca Post and/or Peter Bunce, resulting in Peter's death, was a foreseeable misuse.

84. It has long been feasible for a gun manufacturer like Glock to design pistols that incorporate additional safety features like a heavier trigger pull or an external safety.

85. It has long been recognized in the gun industry that guns can and should be designed so that children cannot accidentally shoot them.

86. The time it takes to disengage a manual or external safety is not significant and does not warrant the absence of such protection on the Baby Glock, which is not typically purchased for on-duty law enforcement.

87. Upon information and belief, Glock's research and development team is aware of other feasible safety devices such as trigger blocks, cable locks, childproofing, or user recognition, to name a few, but has utterly and intentionally failed to include such protections on its products.

88. Glock utterly and intentionally failed to include any safety mechanism on the Baby Glock that would prevent a three-year-old child with weak, tiny hands from accidentally discharging the firearm.

89. The Baby Glock failed to perform as safely as an ordinary consumer would expect when Peter Bunce picked it up from the bedside table, which was reasonably foreseeable.

90. The available alternative designs for the Baby Glock that would have prevented Peter's death were safer, feasible, practical, reasonable, and cost effective.

91.    The danger posed by the Baby Glock's defective design was severe, because the injuries resulting from an unintentional shooting are likely to be catastrophic and life threatening.

92.    The dangers associated with firearms around children, or firearms without external safeties, have been known to manufacturers, distributors, and dealers like Glock for decades.

93.    The likelihood of Peter Bunce accidentally shooting the Baby Glock was high given the information known to Defendants in June of 2021 and at the time Rebecca Post purchased the gun.

94.    The risks created by the Baby Glock's design far outweigh the marginal benefit of having a gun without an external safety, especially for a civilian.

95.    A safer design of the Baby Glock would have been feasible.

96.    There are no significant adverse consequences to the product or the consumer that would result from Defendants implementing a safer design for the Baby Glock.

97.    A safer design for the Baby Glock would eliminate the unsafe nature of the weapon, at least around children, without impairing the product's usefulness or making it too expensive to maintain its utility.

98.    Defendants could have feasibly spread the cost of alternative designs or design changes to consumers through pricing and liability insurance.

99. A reasonable person would conclude that the probability and seriousness of harm caused by the Baby Glock outweighs the burden and cost of taking the safety precautions addressed herein.

100. Defendants failed to adopt safety precautions proportionate to the magnitude of the expected risk associated with the Baby Glock.

101. The Baby Glock that killed Peter remained in a defective condition unreasonably dangerous to human life from the moment it left Glock Ges.m.b.H.'s facility and at all times until Peter's death, and the Baby Glock did not undergo any substantial changes during that time.

102. As a direct and proximate result of Glock's design defect, and the defective and unreasonably dangerous condition of the Baby Glock, Peter's next of kin, including Greg Bunce and Evelyn Bunce, have incurred substantial pecuniary loss, grief, anguish, loss of care, comfort, society, and companionship, and pain and suffering.

103. Because Glock intentionally designs its pistols to be unsafe (i.e. lacking an external safety but possessing a light trigger pull), punitive damages are warranted in this case.

104. Defendants are strictly liable for the actions and inactions described herein, which were the direct and proximate cause of Peter's death.

WHEREFORE, Plaintiff Gregory Bunce hereby demands that the Court enter judgment in his favor, as the Personal Representative of Peter's estate, and against Glock, Inc. and Glock Ges.m.b.H., and award all available damages under the

Vermont Wrongful Death Act, 14 Vt. Stat. Ann. §§ 1491-1492, including pecuniary and punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

**COUNT II**
**STRICT PRODUCTS LIABILITY – FAILURE TO WARN**
**(Both Defendants)**

105.   Plaintiffs repeat and reallege each of the allegations contained in Paragraphs 1 through 104 of their Complaint as if fully stated herein.

106.   Defendants are engaged in the business of selling firearms like the Baby Glock that discharged into Peter's face without an adequate design to stop such an occurrence at the hands of a three-year-old child.

107.   The Baby Glock was sold and/or distributed by Glock, Inc. in a defective condition unreasonably dangerous to the foreseeable, ultimate users of the product, including Peter Bunce.

108.   The Baby Glock was manufactured and/or sold by Glock Ges.m.b.H. in a defective condition unreasonably dangerous to the foreseeable, ultimate users of the product, including Peter Bunce.

109.   Rebecca Post and her house guest, Peter Bunce, were persons whom Glock might reasonably have expected to use the Baby Glock for any purpose that met the specifications set forth by the manufacturer and its warnings/product literature.

110.   The use of the Baby Glock by Rebecca Post and/or Peter Bunce, resulting in Peter's death, was a foreseeable misuse.

111. As described above, Glock's product literature intentionally misleads and deceives end users of its product by providing inadequate warnings that Defendants know will not be followed.

112. Glock's inadequate product warnings are inconsistent with Glock's own marketing efforts as well as the gun industry as a whole, which encourages gun owners to protect themselves with guns.

113. Defendants failed to include warnings that communicated to purchasers like Rebecca Post that the gun's lack of an external safety made it incredibly dangerous by comparison to other handguns designed by the competition.

114. Defendants failed to include warnings that communicated to end users how incredibly light the trigger pull on the Baby Glock was, such that a three-year-old with weak, tiny hands could pull the trigger unintentionally.

115. Upon information and belief, the Baby Glock that killed Peter did not have any warnings on the product itself.

116. Upon information and belief, the Baby Glock that killed Peter was sold without adequate warnings or instructions to properly educate end users about the unique and significant risk of harm to children who may come in contact with a gun that has no manual/external safety but also has a very light trigger pull.

117. Glock's warnings to end users that children are "attracted to" firearms failed to adequately communicate the knowledge that Glock has as a gun manufacturer. Through its own industry knowledge, research, and development, Glock has highly specialized knowledge that the ordinary person lacks about the

frequency with which children will try to play with a loaded firearm. Glock's warnings are woefully inadequate in that they utterly fail to communicate the vast knowledge Glock has about the extreme safety risks handguns pose to children.

118. Glock's warnings also failed to communicate to end users that other feasible safety features exist, but that Defendants chose not to include them on the Baby Glock.

119. Defendants understood their duty to warn in connection with selling the Baby Glock. Defendants could have and should have included stronger, more detailed, and more prominent language and literature to effectively warn and inform potential users of the firearm about the risks it posed and the need to store it safely.

120. Defendant's actions in marketing, distributing, and selling the Baby Glock with such negligent and inadequate warnings, despite its knowledge of the incredible safety risks associated with the product, was outrageous, intentional, and/or undertaken in bad faith for the sole purpose of placing financial gain above safety, in conscious disregard or reckless indifference to the safety of consumers.

121. As a direct and proximate result of Glock's design defect, and the defective and unreasonably dangerous condition of the Baby Glock, Peter's next of kin, including Greg Bunce and Evelyn Bunce, have incurred substantial pecuniary loss, grief, anguish, loss of care, comfort, society, and companionship, and pain and suffering.

122. Because Glock intentionally designs its pistols to be unsafe (i.e. lacking an external safety but possessing a light trigger pull), punitive damages are warranted in this case.

WHEREFORE, Plaintiff Gregory Bunce hereby demands that the Court enter judgment in his favor, as the Personal Representative of Peter's estate, and against Glock, Inc. and Glock Ges.m.b.H., and award all available damages under the Vermont Wrongful Death Act, 14 Vt. Stat. Ann. §§ 1491-1492, including pecuniary and punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

## COUNT III
## NEGLIGENCE
### (Both Defendants)

123. Plaintiffs repeat and reallege each of the allegations contained in Paragraphs 1 through 122 of their Complaint as if fully stated herein.

124. Defendants had a duty to exercise reasonable care in placing a firearm that lacked a manual or external safety into the stream of commerce.

125. Defendants had a duty to exercise reasonable care in designing a trigger pull that was too heavy for a three-year-old with tiny, weak hands to overcome.

126. Defendants had a duty to exercise reasonable care in its approach to research and development regarding the safety issues posed by the Baby Glock, the lack of an external safety, and the 28 Newton trigger pull of the firearm.

127.   Defendants had a duty to exercise reasonable care in its approach to designing safer alternatives for the Baby Glock that were feasible and reasonably calculated to protect human life.

128.   Glock knew or should have known that the Baby Glock, which was not marketed to on-duty law enforcement, posed a grave and foreseeable danger to children.

129.   Glock knew or should have known that a loaded pistol left unsecured and unattended in the presence of a child is reasonably foreseeable to cause severe bodily injury or death to the child or to another person.

130.   Glock had a duty to provide adequate, genuine, and legitimate warnings to end users of the Baby Glock.

131.   Glock breached its duty of care by placing a gun into the stream of commerce that was defectively designed, unaccompanied by adequate warnings, and unreasonably dangerous.

132.   Glock's breach of its duty directly and proximately caused Peter Bunce to suffer serious bodily injury and death, and caused Greg and Evelyn Bunce to suffer severe emotional and mental distress.

133.   Glock's conduct demonstrated a reckless and wanton disregard for human life.

134.   Because Glock intentionally designs its pistols to be unsafe (i.e. lacking an external safety but possessing a light trigger pull), punitive damages are warranted in this case.

WHEREFORE, Plaintiff Gregory Bunce hereby demands that the Court enter judgment in his favor, as the Personal Representative of Peter's estate, and against Glock, Inc. and Glock Ges.m.b.H., and award all available damages under the Vermont Wrongful Death Act, 14 Vt. Stat. Ann. §§ 1491-1492, including pecuniary and punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Both Defendants)

135.   Plaintiffs repeat and reallege each of the allegations contained in Paragraphs 1 through 134 of their Complaint as if fully state herein.

136.   Plaintiff Greg Bunce was in the zone of danger created by Defendants' negligence, because he was only feet away in a downstairs bathroom when Peter shot himself with the Baby Glock.

137.   Greg Bunce heard and recognized the sound of the gunshot, which placed him in reasonable fear of immediate personal injury.

138.   Defendants negligently inflicted emotional distress on Greg Bunce by causing him to be a bystander to the horrific scene of his son's death.

139.   Greg suffered serious emotional and mental distress as a direct result of Glock's negligence.

140.   Glock's conduct demonstrated a reckless and wanton disregard for Greg Bunce's safety and security.

WHEREFORE, Plaintiff Gregory Bunce hereby demands that the Court enter judgment in his favor and award all available damages for negligent infliction of emotional distress, including compensatory and punitive damages, interest, costs, attorney's fees, and such other and further relief as the Court deems just and appropriate.

**COUNT V**
**LOSS OF CONSORTIUM**

141.   Plaintiffs repeat and reallege each of the allegations contained in Paragraphs 1 through 140 of their Complaint as if fully state herein.

142.   Plaintiff Evelyn Bunce has suffered the loss of care, comfort, society, and companionship of her husband as a result of him being a bystander to the horrific accidental shooting of their son, Peter, as well as being in the zone of danger described above.

143.   Plaintiff Evelyn Bunce's claim is derivative of Greg Bunce's negligent infliction of emotional distress claim.

WHEREFORE, Plaintiff Evelyn Bunce hereby demands that the Court enter judgment in her favor and award all available damages for loss of consortium, and such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Vt. R. Civ. P. 38, Plaintiffs Gregory Bunce, individually and as Personal Representative of the Estate of Peter D. Bunce, and Evelyn Bunce, individually, demand a trial by jury of all issues so triable in the above-captioned action.

Respectfully submitted,

Dated: June 22, 2023

Laura H. White, Esq. (Bar No. 4025)
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Road, Suite 21
Kennebunk, Maine 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*